NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 21

No. 25-AP-131

| | |
|---|---|
| Protect Our Wildlife, a nonprofit 501(c)(3) organization et al. | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Washington Unit, Civil Division |
| Fish and Wildlife Board, an Agency of the State of Vermont et al. | January Term, 2026 |

Timothy B. Tomasi, J.

Rachel L. Seelig, Megan E. Grove, and Geoffrey H. Hand of SRH Law PLLC, Burlington, for Plaintiffs-Appellants.

Charity R. Clark, Attorney General, and Justin G. Sherman, Assistant Attorney General, Montpelier, for Defendants-Appellees.

PRESENT: Reiber, C.J., Eaton and Waples, JJ., and Valente, Supr. J., and Cohen, J. (Ret.), Specially Assigned

¶ 1. **WAPLES, J.** Plaintiffs Protect Our Wildlife, Animal Wellness Action, Center for a Humane Economy, and Vermont Wildlife Coalition appeal the civil division's decision affirming the validity of amendments to a Fish and Wildlife Board rule regulating trapping and coyote hunting with dogs, to which the Legislative Committee on Administrative Rules (LCAR) formally objected. Plaintiffs argue that the civil division improperly relieved the Board of its statutory burden to prove that the objected-to portions of the rule were valid. Plaintiffs further argue that three aspects of the rule are inconsistent with legislative intent and arbitrary: the definition of "control" of a coyote-hunting dog, the definition of a "public trail" for purposes of trapping, and the exemption of traps set in water or ice from setback requirements. We agree that LCAR's objections meant that the Board had the burden of proving the validity of the objected-to portions

of the rule. However, we conclude that the Board met that burden and therefore affirm the trial court's decision.

## I. Factual Background

¶ 2.     In 2022, the Legislature passed Act 165, which required the Fish and Wildlife Board to adopt a rule regulating the pursuit of coyote with the aid of dogs.[1]  Among other criteria, the rule was required to include "a definition of control to minimize the risk that dogs pursuing coyote: (A) enter onto land that is posted against hunting; (B) enter onto land where pursuit of coyote with dogs is not authorized; (C) harass or harm people or domestic animals; and (D) cause other unintentional damages to people or property."  2021, No. 165 (Adj. Sess.), § 3(b)(4).  Act 165 imposed a moratorium on hunting coyote with dogs, with some exceptions, until the Board's rule became effective.  Id. § 2.

¶ 3.     During the same session, the Legislature also passed Act 159, "[a]n act relating to best management practices for trapping."  Act 159 required the Commissioner of Fish and Wildlife to submit to the Legislature best management practices for trapping "that propose criteria and equipment designed to modernize trapping and improve the welfare of animals subject to trapping programs."  2021, No. 159 (Adj. Sess.), § 1(a).  The best management practices were to include recommended "requirements for the location of traps, including the placing of traps for purposes other than nuisance trapping at a safe distance, from public trails, class 4 roads, playgrounds, parks, and other public locations where persons may reasonably be expected to recreate."  Id. § 1(a)(4).  Act 159 directed the Board to revise its existing trapping rules by January 2024 and required that "[t]he revised rules shall be at least as stringent as best management practices for trapping recommended by the Department of Fish and Wildlife to the General Assembly."  Id. § 2(b).

---

[1]  Prior to Act 165, there were no regulations governing hunting coyotes with dogs in Vermont.

¶ 4.     In August 2023, the Board sent LCAR a proposed amended furbearing species rule that responded to Acts 159 and 165.  The proposed rule created a permitting process for pursuing or taking coyote with dogs, set an annual limit on the number of permits, described the legal means of taking coyotes, required hunting dogs to be equipped with GPS collars, and set seasons and shooting hours for taking coyote with dogs.  The proposed rule also prohibited traps from being set within fifty feet of the traveled portion of a legal trail, public trail, or public highway, unless set in the water.  The proposed rule initially defined "public trail" to mean a pedestrian footpath on state-owned land that was open to the public and designated and mapped by the managing agency or department.  It also defined "trapping" to mean "to hunt, take or attempt to take fur-bearing animals with traps including the dispatching of such lawfully trapped furbearing animals."

¶ 5.     In October 2023, LCAR responded with a letter seeking modifications to the proposed rule.  LCAR asserted that the rule was insufficient to minimize the risk that dogs pursuing coyote would enter onto land that was posted against hunting or where pursuit of coyote with dogs was not authorized.  LCAR further asserted that the definition of public trail and the exemption for trapping in water or ice from setback requirements were inconsistent with legislative intent.[2]

¶ 6.     On November 13, 2023, the Board notified LCAR that it had revised the proposed rule by, among other changes, expanding the definition of public trail to include unmapped designated trails on public land as well as rail trails, the Long Trail, and the Appalachian Trail, and requiring that coyote hunters be able to locate and remotely recall dogs using GPS collars at all times.  The revised rule retained the exemption for traps set in water and expanded that exemption to traps set in ice.  The Board explained that the risk such traps posed to the public or

_____

        [2] LCAR also objected to including the term "hunting" in the definition of trapping in the rule.  The Board declined to modify this definition, asserting that it was consistent with the common meaning of trapping and the Vermont Constitution.  Plaintiffs challenged this aspect of the rule in the trial court but do not pursue the issue on appeal.

3

pets was low and that to require a setback in water would make it difficult to trap animals, like beavers, that are most active near the shoreline.

¶ 7. The revisions did not satisfy LCAR, and on November 16, 2023, LCAR informed the Board that it had voted to formally object to the definitions of control and public trail and the exemption from setback requirements of traps set in the water or under ice. It asserted that these portions of the rule were contrary to legislative intent as expressed in Acts 159 and 165.

¶ 8. In response, the Board made some slight changes to the definitions of control and public trail but declined to modify the exemption for traps set in the water or under ice. In December 2023, it adopted the amended rule over the objections of LCAR. LCAR then certified its objections to the Secretary of State.

¶ 9. In January 2024, plaintiffs filed a complaint in the civil division for declaratory and injunctive relief against the Fish and Wildlife Board, the Fish and Wildlife Department, and the Commissioner of the Fish and Wildlife Department. Plaintiffs sought a declaratory judgment that the objected-to portions of the final furbearing species rule were contrary to legislative intent and asked the court to set aside the rule. Plaintiffs also sought a preliminary injunction prohibiting coyote hunting with dogs, asserting that LCAR's objections to the rule meant that the moratorium in Act 165 was still in effect until the Board proved that the rule was consistent with legislative intent and not arbitrary.

¶ 10. Following a hearing, the trial court denied the preliminary injunction. The court observed that although plaintiffs would normally bear the burden of proving that they were likely to succeed on the merits of their complaint, LCAR's objections meant that the Board bore the ultimate burden of proving that the rule complied with legislative intent. The court noted that to the extent plaintiffs argued that the rule was arbitrary and capricious, LCAR did not object on those grounds. Thus, it reasoned, the rule was entitled to its ordinary presumption of validity on that issue and plaintiffs bore the burden of proving otherwise. The court held that § 2 of Act 165

4

ended the coyote-hunting moratorium on the date that the rule became effective, and LCAR's objection did not stay that effective date. The court further held that the Board was likely to be able to prove that the rule was consistent with legislative intent and that plaintiffs had not demonstrated a threat of irreparable harm or that denial of the injunction would present a significant hardship to plaintiffs or contravene the public interest.

¶ 11. In their briefing on the merits, plaintiffs argued that under 3 V.S.A. § 842(c)(2), LCAR's objections shifted the burden to the Board to prove by clear and convincing evidence that the objected-to portions of the rule were consistent with legislative intent and not arbitrary. Plaintiffs argued that the Board had the burden of proving that all of the criteria set forth in § 842(c)(2) were satisfied. Plaintiffs argued that the rule's definition of "control" of coyote-hunting dogs failed to "minimize" the risk that dogs pursuing coyote would enter onto posted land, harass people or animals, or damage people or property, as required by Act 165, and arbitrarily ignored better methods of control, such as requiring specific training and certification, requiring handlers to keep dogs within sight, and requiring dogs to wear vests or other visible markings. Plaintiffs further argued that the definition of public trail was inconsistent with the common meaning of that term in Vermont, which includes trails on private property. Plaintiffs also contended that the exemption from setback requirements for traps set in water or on ice was not supported by any evidence and was inconsistent with Act 159's requirement that traps be set at a safe distance from places where people may be expected to recreate.[3]

¶ 12. In its final decision, the trial court reaffirmed its prior holding that LCAR's objections only removed the presumption of validity as to the ground that was the basis for the objections, which was that the objected-to portions of the rule were inconsistent with legislative intent. Accordingly, plaintiffs retained the burden of proving their claims that those sections were

---

[3] Plaintiffs also challenged the provision allowing body-gripping traps but do not pursue this challenge on appeal.

arbitrary. The court rejected plaintiffs' argument that the Board was required to meet its burden by clear and convincing evidence. It agreed, however, that the Board's interpretation of Acts 159 and 165 was not entitled to deference and that it should review the statutory language de novo.

¶ 13. Turning to the merits, the court rejected plaintiffs' argument that in directing the Board to define "control," Act 165 required the rule to "minimize" the risks of trespassing or harming people or property, meaning not just to reduce but to reduce as much as possible. The court rejected this interpretation as unreasonable and held that the rule's provisions were designed to reduce the risk of conflict and were not arbitrary. The court held that the rule's definition of public trail was reasonable and consistent with Act 159. It upheld the exemption for traps set in water or under ice as consistent with legislative intent and the evidence available to the Board. This appeal followed.

II. Analysis

¶ 14. On appeal, plaintiffs argue that the trial court misinterpreted 3 V.S.A. § 842(c)(2) when it held that the burden of proving the rule's validity shifted to the Board only with respect to the ground on which LCAR objected, which was legislative intent. They contend that once LCAR objects to a rule or part of a rule, the agency has the burden of proving all of the factors set forth in § 842(c)(2) by clear and convincing evidence. Plaintiffs claim that the Board failed to meet this burden with respect to the rule's definitions of "control" and "public trail" and the setbackexemption for traps set in water or under ice, arguing that these provisions are inconsistent with legislative intent and arbitrary.[4]

¶ 15. As explained below, we agree with plaintiffs that the effect of LCAR's objections was to shift the burden to the Board of proving the validity of the objected-to provisions on all bases set forth in § 842(c)(2). However, we disagree that the Board was required to meet this

---

[4] Plaintiffs do not challenge the court's conclusions that they lacked standing to challenge the rule's definition of trapping or that the rule's provisions concerning body-gripping traps were valid.

6

burden by clear and convincing evidence. We further conclude that the Board showed that the challenged provisions are consistent with legislative intent and are not arbitrary and therefore affirm the decision below.

A. Scope of Burden Shift Under 3 V.S.A. § 842(c)(2)

¶ 16. We begin by addressing the proper interpretation of § 842(c)(2). Our goal in interpreting a statute is to give effect to legislative intent, and "we presume the Legislature intended the plain, ordinary meaning of the statute." Swett v. Haig's, Inc., 164 Vt. 1, 5, 663 A.2d 930, 932 (1995). We review the construction of a statute de novo. Vt. Hum. Rts. Comm'n v. State, 2012 VT 45, ¶ 4, 191 Vt. 485, 49 A.3d 149.

¶ 17. Section 842 is part of the subchapter governing administrative rulemaking in the Vermont Administrative Procedure Act. The statute requires that after an agency proposes a rule, holds a hearing, and receives public comment, the agency must file a final proposed rule with LCAR. 3 V.S.A. §§ 836(a), 841-42. Within forty-five days after the filing of a final proposed rule, LCAR may object and recommend the agency amend or withdraw the proposal. Id. § 842(a)(1). Section 842(b) sets forth the following seven grounds for objection:

> (1) a proposed rule is beyond the authority of the agency;
>
> (2) a proposed rule is contrary to the intent of the Legislature;
>
> (3) a proposed rule is arbitrary;
>
> (4) the agency did not adhere to the strategy for maximizing public input prescribed by the Interagency Committee on Administrative Rules;
>
> (5) a proposed rule is not written in a satisfactory style in accordance with section 833 of this title;
>
> (6) the economic impact analysis fails to recognize a substantial economic impact of the proposed rule, fails to include an evaluation and statement of costs to local school districts required under section 838 of this title, or fails to recognize a substantial economic impact of the rule to such districts; or
>
> (7) the environmental impact analysis fails to recognize a substantial environmental impact of the proposed rule.

7

The agency must respond to LCAR's objection within fourteen days. Id. § 842(a)(2). LCAR may then withdraw or modify its objection. Id. § 842(a)(3). If LCAR does not withdraw its objection after the agency responds, and a majority of the committee agrees, LCAR may file the objection in a certified form with the Secretary of State. Id. § 842(c)(1).

¶ 18. The legal effect of a certified objection is set forth in § 842(c)(2):

> After a Committee objection is filed with the Secretary under this subsection, or on the same grounds under subsection 817(d) of this title, to the extent that the objection covers a rule or portion of a rule, the burden of proof thereafter shall be on the agency in any action for judicial review or for enforcement of the rule to establish that the part objected to is within the authority delegated to the agency, is consistent with the intent of the Legislature, is not arbitrary, and is written in a satisfactory style in accordance with section 833 of this title, and that the agency did adhere to the strategy for maximizing public input prescribed by the Interagency Committee on Administrative Rules and its economic and environmental impact analyses did not fail to recognize a substantial economic or environmental impact. The objection of the Committee shall not be admissible evidence in any proceeding other than to establish the fact of the objection. If the agency fails to meet its burden of proof, the court shall declare the whole or portion of the rule objected to invalid.

¶ 19. Here, the trial court interpreted § 842(c)(2) to shift the burden of proof only "to the extent" of LCAR's objection, which it held meant the substantive ground asserted by LCAR. This interpretation fails to give effect to the plain language of the provision. Where LCAR does object to the language of a rule, the phrase "to the extent" limits the burden-shifting to the specific rule or portion of the rule objected to, but it does not limit the grounds the agency must prove. The phrase recognizes that LCAR's objection may be, but is not necessarily, related to the specific language of a rule; for example, LCAR could be objecting on the more general ground that the agency failed to maximize public input when creating the rule.

¶ 20. This is evident from a close examination of the first sentence of § 842(c)(2) as a whole. It states that "to the extent that the objection covers a rule or portion of a rule, the burden of proof thereafter shall be on the agency . . . to establish" that the rule or rule part is within the agency's authority, consistent with legislative intent, not arbitrary, "and is written in a satisfactory

8

style . . . <u>and</u> that the agency did adhere to the strategy for maximizing public input . . . <u>and</u> its economic and environmental impact analyses did not fail to recognize a substantial economic or environmental impact." <u>Id</u>. (emphases added). The Legislature's repeated use of the word "and" "indicates an intent for the phrases to be conjunctive." <u>In re Request for Jurisdictional Opinion re: Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A</u>, 2015 VT 41, ¶ 15, 198 Vt. 510, 117 A.3d 457. In other words, to comply with § 842(c)(2), it is necessary for the agency to demonstrate that each of the seven listed factors is satisfied. See 1A S. Singer, Sutherland Statutory Construction § 21:16 (8th ed. 2025) (" 'And' normally applies where a statute contains two or more requirements and they all must be fulfilled in order to comply with the law. Stated differently, the use of the conjunction 'and' linking words together in a statute usually signifies that all words are required." (footnote omitted)). "[W]e presume that the [L]egislature chose its words advisedly," <u>Robes v. Town of Hartford</u>, 161 Vt. 187, 193, 636 A.2d 342, 347 (1993), and must give effect to its intent as expressed in the plain language of the statute.

¶ 21. The Supreme Court of New Hampshire reached a similar conclusion when interpreting a similar provision of New Hampshire's administrative procedure act in <u>Appeal of Toczko</u>, a declaratory judgment action challenging the New Hampshire Department of Safety's administrative rules regulating water ski craft. Under the law then in effect, a formal objection to a final rule by the joint legislative committee on administrative rules "shift[ed] to the commissioner the burden of demonstrating that the rules are 'within the authority delegated to the agency, [are] consistent with the intent of the legislature, and [are] in the public interest.' " <u>Appeal of Toczko</u>, 618 A.2d 800, 802 (N.H. 1992) (second and third alterations in original) (quoting N.H. R.S.A. 541-A:3-e, VI (Supp. 1991)).[5] The Department of Safety argued that the petitioners' failure to

---

[5] New Hampshire's statute was subsequently recodified, and the cited provision was amended to add a fourth factor for the agency to prove in a judicial challenge to an objected-to rule: that the rule "does not have a substantial economic impact not recognized in the fiscal impact statement." N.H. Rev. Stat. Ann. § 541-A:13 (2023).

plead the issues of delegated authority or public interest "foreclose[d] these issues from the declaratory judgment." Id. at 803. The court rejected this argument, pointing to the plain language of the statute:

> This argument ignores the impact of the APA, which shifts to the commissioner the burden of proving that the rules are within the agency's delegated authority, consistent with the legislature's intent, and in the public interest. Because the petitioners pled the fact that the joint legislative committee objected to the proposed rules, the commissioner must now allege and establish these three issues as a rebuttal. The petitioners carry no burden of pleading issues which might be raised by the agency as a defense.

Id. (emphasis added) (citation omitted).

¶ 22. Similar to the New Hampshire statute quoted above, the effect of an LCAR objection under the plain language of § 842(c)(2) is to shift to the agency the burden of proving that the rule or part of the rule objected to is within the agency's authority, consistent with legislative intent, not arbitrary, written in a satisfactory style, and that the agency adhered to the strategy for maximizing public input and did not fail to recognize a substantial economic or environmental impact. The second-to-last sentence of § 842(c)(2) makes clear that the fact of LCAR's objection, not the substantive basis for the objection, is the trigger for this burden shifting, as it prohibits the objection from being used for any other purpose. Thus, as in Toczko, because plaintiffs pled the fact that LCAR objected to portions of the proposed rule, the Board was required to establish all of the elements listed in § 842(c)(2) in rebuttal.

¶ 23. Notwithstanding their insistence that the burden shifted on all seven factors, plaintiffs failed to argue below or on appeal that the Board did not meet its burden on any ground other than legislative intent and arbitrariness. The parties focused solely on whether the objected-to portions of the rule satisfied those two factors; they did not present argument on the other five factors listed in § 842(c)(2), and the trial court made no ruling on those factors. Because plaintiffs do not raise this issue on appeal, we conclude that plaintiffs have forfeited any claim that the

10

objected-to portions of the rule do not comply with factors (1), (4), (5), (6) or (7).[6]  See State v.

Ben-Mont Corp., 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994) ("To properly preserve an issue for

appeal a party must present the issue with specificity and clarity in a manner which gives the trial

court a fair opportunity to rule on it.").

### B. Clear and Convincing Evidence

¶ 24.   We therefore turn to plaintiffs' argument that the Board should be required to prove

the § 842(c)(2) factors by clear and convincing evidence.  Plaintiffs contend that because the

purpose of § 842(c)(2)'s burden-shifting provision is to encourage agencies to amend their rules

to retain their presumption of validity, an agency should be subject to a higher standard of proof

when LCAR objects to a rule.

¶ 25.   Typically, this Court defers to an agency's interpretation of its enabling legislation,

and agency rules implementing that legislation are entitled to a presumption of validity.  State v.

Rolfe, 166 Vt. 1, 8, 686 A.2d 949, 955 (1996).  Thus, we have held that the court "must defer to

the agency's judgment absent a compelling indication" that it misinterpreted the enabling statute.

Vt. Ass'n of Realtors, Inc. v. State, 156 Vt. 525, 530, 593 A.2d 462, 465 (1991) (quotation

omitted).  Section 842(c)(2) removes this presumption of validity by forcing the agency to

affirmatively prove compliance with the seven factors when the objected-to rule is challenged in

a judicial proceeding.  However, the statute does not indicate that the agency is also subject to a

higher standard of proof in such a proceeding.  "Generally, the standard of proof for civil and

administrative proceedings in this state is a preponderance of the evidence."  Shaw v. Vt. Dist. Ct.,

152 Vt. 1, 6, 563 A.2d 636, 639 (1989); see also 2 K. Broun et al., McCormick on Evidence, § 340

(R. Mosteller ed., 9th ed. 2025) (explaining that "the traditional measure of persuasion in civil

cases is by a preponderance of evidence").  The clear-and-convincing evidence standard is used in

---

[6]  We note that the Board addressed these factors in the attachments to the final proposed rule it filed with the Secretary of State.

cases involving fraud, deprivation of individual constitutional rights, or when explicitly required by statute. Section 842(c) contains no such requirement, and this case does not involve the type of factual scenario that would support the judicial imposition of an elevated standard of proof.

¶ 26. Plaintiffs argue that their position is supported by the comment to § 3-204 of the 1981 Model State Administrative Procedure Act, which, like Vermont's statute, was based on Iowa's administrative procedure act and was adopted by the Uniform Law Commission around the same time that Vermont enacted § 842. They note that the drafters of the model act describe the agency's burden as a "special burden" and contend that this requires a higher standard of proof. Model State Admin. Proc. Act 1981 § 3-204 cmt. (Unif. L. Comm'n 1981). We have reviewed the comment and this statement clearly refers to the fact that the person challenging a rule, and not the agency, usually bears the burden of proving that it is invalid. Thus, the burden shift imposed by a legislative objection is a "special" or "unusual" one. Id. The comment observes that an agency may be less amenable to modifying a rule if it is confident "that it can overcome its special burden of persuading the court that the rule in that form is lawful in all respects," but a formal objection will encourage an agency to modify the rule if it is not clearly procedurally and substantively lawful. Id. These statements merely reflect the incentives created by the burden-shifting provision and do not show that the agency is also subject to a higher standard of proof under the existing statutory language. Insofar as plaintiffs point to no authority that persuasively supports their claim, we decline to judicially adopt a clear-and-convincing standard for proceedings under § 842(c)(2).

¶ 27. However, legislative adoption of a heightened standard for judicial review in such cases would be consistent with separation-of-powers principles. Chapter II, § 5 of the Vermont Constitution directs that the "Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." Vt. Const. ch. II, § 5. This separation of powers is "guarded by a series of checks and balances so adjusted as to

avoid usurpation of power by any one branch." Hartness v. Black, 95 Vt. 190, 197, 114 A. 44, 47 (1921). The LCAR objection process is one such check, ensuring that executive agency rulemaking action conforms to the agency's enabling legislation. When the Legislature, through LCAR, takes the serious and considered step of formally objecting to an agency rule, it is exercising its critical and fundamental role as a check on the executive. In such cases, it would be consistent with the principles underlying separation of powers for the agency to have to meet a higher standard of proof when the validity of the rule is challenged in court, at least with regard to the § 842 factors that require evidentiary support. Mindful of the limits of our own role, however, we decline to judicially impose such a requirement where the Legislature has not expressly done so in § 842(c).

¶ 28. We agree with the trial court, however, that an LCAR objection necessarily removes the deference we would normally give to an agency's interpretation of the enabling statute for the objected-to rule. Cf. Rolfe, 166 Vt. at 8, 686 A.2d at 955 (explaining that this Court ordinarily defers to agency's interpretation of its enabling legislation). To hold otherwise would relieve the agency of some of its burden under § 842(c)(2) and would be inconsistent with the intent of that provision. Thus, in addressing plaintiffs' substantive challenges to the rule we independently construe the language of Acts 159 and 165, without giving deference to the Board's interpretation. See State v. Therrien, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129 ("The interpretation of a statute is a question of law that we review de novo."). This is consistent with our approach in other cases where an agency's action has been challenged on similar grounds to the objections listed in § 842(b) and (c)(2). See, e.g., In re Conservation L. Found., 2018 VT 42, ¶ 16, 207 Vt. 309, 188 A.3d 667 (explaining that Court accords presumption of validity to agency interpretation of rule but will still conduct independent review and will overturn agency interpretation that exceeds statutory authority, conflicts with prior interpretations, "results in

13

unjust, unreasonable or absurd consequences, or that demonstrates compelling indications of error" (citation omitted) (quotations omitted)).

## C. Definition of Control

¶ 29.    Plaintiffs assert that the Board did not meet its burden of demonstrating that the definition of "control" in the rule is consistent with legislative intent and not arbitrary. "In construing legislative intent, we must consider the entire statute, including its subject matter, effects and consequences, as well as the reason for and spirit of the law." Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215 (quotation omitted). "To determine whether the Board acted 'arbitrarily,' we must decide whether the decision makes sense to a reasonable person . . . ." In re Town of Sherburne, 154 Vt. 596, 605, 581 A.2d 274, 279 (1990); see also 3 V.S.A. § 801(13)(A) (stating that agency action is arbitrary if it lacks factual basis, "is not rationally connected to the factual basis asserted for the decision," or "would not make sense to a reasonable person").

¶ 30.    Act 165 required the Board to adopt "a definition of control to minimize the risk that dogs pursuing coyote: (A) enter onto land that is posted against hunting; (B) enter onto land where pursuit of coyote with dogs is not authorized; (C) harass or harm people or domestic animals; and (D) cause other unintentional damages to people or property." 2021, No. 165 (Adj. Sess.), § 3(b)(4). The final rule contained the following definition of control:

> "Control of dogs(s)" means that when transporting, loading, or unloading dogs from vehicle(s); and handling, catching, restraining, releasing, or following dogs at all times during training dogs and taking of coyote with the aid of dogs; the permittee shall be able to locate and remotely recall the dogs. Collar(s) with GPS functions, track log capability, and training/control features in the collar(s) shall be required to locate and track dogs at all times while taking coyote with the aid of dogs. At no time shall dogs be in pursuit of coyote without a GPS track log being maintained by the permit holder.

10 V.S.A. App. Ch. 1, § 44(3.6). Elsewhere, the rule provides that a " '[t]raining/control' collar is any family of collars that deliver audible tones and electrical stimulation of varying intensity

and duration to the neck of a dog via a radio-controlled electronic device incorporated into the collar." Id. § 44(3.19). The rule requires persons hunting coyote with dogs to attach GPS collars with "tracklog capability" and "training/control features for remote recall," as well as tags indicating that the dog has been registered with the Department and identifying the owner. Id. § 44(4.20.3(d)(3)). "A person taking a coyote with the aid of dogs shall maintain a GPS location log of each dog taking coyote and shall maintain the log for at least 30 days after the close of the season" and "shall only take a coyote with a Pack of Dogs as defined" in the rule. Id. § 44(4.20.3(d)(4)-(5)); see also id. § 44(3.12) (defining "Pack of Dogs" as "one to four dogs, acting as a unit during taking coyote with the aid of dogs"). Hunters must report "no later than 48 hours after the close of season . . . the taking of all coyotes during the season in a manner required by the Commissioner." Id. § 44(4.20.6). Hunters who violate the rule are subject to civil or criminal penalties. See 10 V.S.A. §§ 4515, 4551, 4552, 4572, 5009.

¶ 31. Plaintiffs argue that the rule fails to effectuate Act 165's requirement that the definition of control "minimize" the risk of trespassing, personal injury, or property damage because the only means of control specified by the rule is the use of GPS collars, which plaintiffs assert are inadequate. Act 165 does not define the term "minimize." The ordinary definition is "to reduce or keep to a minimum." Minimize, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/minimize (last accessed June 4, 2026). Minimum, in turn, means "the least quantity assignable, admissible, or possible." Minimum, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/minimum (last accessed June 4, 2026). Plaintiffs argue that Act 165 therefore requires the Board to adopt a means of control that keeps the risk of dogs trespassing or causing damage to the least quantity possible, such as requiring dogs to be kept on leashes or within sight.

¶ 32. The term "minimize" must be construed consistently with the statute as a whole. Shires Hous., 2017 VT 60, ¶ 9. Act 165 contains the following statement of legislative intent:

> The General Assembly through the rules required under this section intends to reduce conflicts between landowners and persons pursuing coyote with the aid of dogs by reducing the frequency that dogs or persons pursuing coyote enter onto land that is posted against hunting or land where pursuit of coyote with dogs is not authorized. In addition, the General Assembly intends that the rules required under this section support the humane taking of coyote, the management of the population in concert with sound ecological principles, and the development of reasonable and effective means of control.

2021, No. 165 (Adj. Sess.), § 3(a). This provision makes clear that the Legislature did not intend for the Board to regulate coyote hunting out of existence, but instead to adopt rules that would lessen conflicts between hunting dogs and others while still encouraging responsible hunting. Viewed in this context, we conclude that the term "minimize" in § 3(b)(4) of Act 165 means to reduce the risk of conflict to the least quantity possible that still reasonably allows hunting to occur.

¶ 33. The rule's definition of control is consistent with this construction. Section 3.6 requires a hunter to be able to locate and remotely recall dogs "at all times" while hunting coyote. 10 V.S.A. App. Ch. 1, § 44(3.6). This is a strict definition of control that is designed to further the legislative goal of minimizing unwanted behaviors by coyote-hunting dogs. While the rule also mandates the use of GPS collars, the use of collars by itself is not compliance—the rule requires hunters to actually be able to locate and recall the dogs, and failure to do so will subject them to penalties.

¶ 34. Plaintiffs argue that the Board was required by Act 165 to demonstrate that GPS collars are an "effective" means of control and failed to do so. This argument is unpersuasive. First, plaintiffs mischaracterize what is required by the statute. Act 165 states that the Legislature "intends that the rules required under this section support . . . the development of reasonable and effective means of control." 2021, No. 165 (Adj. Sess.), § 3(a). This language does not require the Board to adopt or generate a perfect means of control, but to adopt rules that "support . . . development" of "reasonable and effective" means. Id.

¶ 35.    Further, the Board presented evidence that GPS collars that can generate audible tones are "reasonable and effective." The Board presented evidence from a wildlife biologist that hunting dogs are "tone broke," meaning that they stop what they are doing when the audible tone is activated. Puppies learn to obey the tone after two or three corrections. Even in a "full-blown chase," the hunter can stop the dogs with a tone if they are about to cross into private property. Moreover, modern GPS collars are an improvement over older radio collars. GPS is satellite-based and does not rely upon cellular telephone service, which can be spotty in Vermont. GPS allows hunters to track dogs in real time and can be overlaid on parcel maps indicating property lines. In addition, hunters can tell if their dogs are chasing a coyote by how they move across the landscape—running and circling typically indicates a coyote, while running in a straight line indicates a bear or a fox. The GPS unit also informs the hunter when dogs are barking. When dogs are close to a coyote, barking intensity increases. This enables hunters to make informed decisions about when to recall their dogs. Coyote hunters actively follow their dogs on vehicles to be able to intercept them.

¶ 36.    Plaintiffs point to evidence that some GPS collars have finite ranges and are not one-hundred-percent effective in keeping dogs out of posted property in hilly terrain, and that hunters may be hesitant to shock their dogs to avoid making them not want to hunt. Act 165 required the Board to adopt a definition of control that minimizes risk of trespassing or damage; it did not require the Board to completely eliminate such risks. Thus, the fact that GPS collars may have some limitations does not mean that the Board's incorporation of them into the definition of control makes the rule arbitrary or inconsistent with legislative intent.

¶ 37.    Plaintiffs further argue that other means of control are more effective and the Board's failure to adopt these means renders the rule arbitrary. The Board specifically considered the argument that leashing or requiring dogs to remain within visible or audible distance would be a more effective means of control. The Board explained that these methods were not feasible when

17

hunting coyote. It presented evidence that coyotes and dogs can run twenty to forty miles an hour, which is much faster than the average human can run. Dogs chase coyotes through rough, wooded terrain, making it impossible for a hunter to maintain continuous sight or voice distance. Thus, requiring dogs to be leashed or kept within sight at all times would effectively amount to a ban on hunting coyote with dogs, which is contrary to the stated intent of Act 165. The Board's explanation for its chosen definition of control is reasonable and supported by the record, and is therefore not arbitrary.

### D. Definition of Public Trail

¶ 38. We next address plaintiffs' claim that the rule's definition of "public trail" is contrary to legislative intent as expressed in Act 159 and is arbitrary. As explained above, Act 159 required the Department to submit best management practices (BMPs) for trapping to the Legislature by January 15, 2023. 2021, No. 159 (Adj. Sess.), § 1. The BMPs recommended by the Department were to include "requirements for the location of traps, including the placing of traps for purposes other than nuisance trapping at a safe distance, from public trails, class 4 roads, playgrounds, parks, and other public locations where persons may reasonably be expected to recreate." Id. § 1(a)(4). Act 159 further directed the Board to revise Vermont's trapping rules to be "at least as stringent as best management practices for trapping recommended by the Department of Fish and Wildlife to the General Assembly." Id. § 2(b).

¶ 39. Plaintiffs provided only a portion of the Department's BMP report in their printed case, which omits the Department's recommendations regarding trapping setbacks. According to the report available on the Department's website, the BMPs submitted by the Department to the Legislature recommended that traps be set at least twenty-five feet away from public highways or trails on state-owned public land, "unless set in a culvert, in the water, or at least 5' above the ground." Vt. Fish & Wildlife Dep't, Report to the Legislature, Response to Act 159, at 9 (Jan. 17, 2023), https://www.vtfishandwildlife.com/trapping-bmps-and-coyote-hunting-regulations-

18

updates. As the trial court noted, plaintiffs did not contest that the rule's trapping provisions were "at least as stringent" as the Department's BMPs, as required by Act 159. Instead, the parties below and on appeal focused on whether the Board's rule was consistent with Act 159's intention that trapping occur at a "safe distance" from public trails and other recreational areas.

¶ 40. The amendments adopted by the Board prohibit traps from being set within fifty feet of "the travelled portion of a legal trail, public trail or public highway, unless set in the water or under ice," and from within 100 feet of parks, playgrounds, and other areas "owned and managed by municipal, state or federal entities," unless set in the water or under ice. 10 V.S.A. App. Ch. 1, § 44(4.15). The rule defines "public trail" as follows:

> a) a path or corridor open to the public, used for nonmotorized recreational purposes such as hiking, walking, bicycling, cross-country skiing, horseback riding, and other similar activities; that is designated and mapped by a municipality on municipal lands, the managing agency or department on Vermont state owned land, or a federal agency on federal land; within the state of Vermont;
>
> b) a path or corridor open to the public, commonly used for nonmotorized recreational purposes such as hiking, walking, bicycling, cross-country skiing, horseback riding, and other similar activities; that is designated, managed, maintained and clearly marked as a trail on municipal lands, on Vermont state-owned land, or on federal land, within the state of Vermont; or
>
> c) Vermont Rail Trails designated and mapped by the Vermont Agency of Transportation, the Appalachian Trail designated, mapped and managed by the National Park Service, and the Long Trail designated, mapped and managed by the Green Mountain Club.

Id. § 44(3.14).

¶ 41. Plaintiffs argue that Vermont has a longstanding tradition of public access to private land and that many recreational trails cross private land. Plaintiffs argue that because Act 159 required the Board to protect places where the public recreates, the rule's definition of a public trail should include trails that are on private land.

¶ 42. Act 159 does not define the term "public trail." Clarification in the rule was therefore important to provide notice to trappers and the public of where setbacks apply,

particularly since violators may face criminal penalties. Cf. State v. Cantrell, 151 Vt. 130, 133, 558 A.2d 639, 641 (1989) (explaining that penal statutes must "define a criminal offense with sufficient certainty so as to inform a person of ordinary intelligence of conduct which is proscribed, and such that arbitrary and discriminatory enforcement is not encouraged").

¶ 43. The Board's definition clarifies that public trails, for the purposes of trapping, include designated trails on public land, Vermont rail trails, and the two major long-distance hiking trails that pass through the state of Vermont. This definition is consistent with Act 159, which includes "public trails" as one of several listed "public locations" from which traps must be placed at a safe distance. As the trial court observed, the terms "public trail" and "public location" can reasonably be understood to exclude private trails and private locations, which may be closed to public use at the owner's discretion. Cf. Property, Black's Law Dictionary (12th ed. 2024) (defining private property as property "protected from public appropriation—over which the owner has exclusive and absolute rights" and public property as "State- or community-owned property not restricted to any one individual's use or possession"). The other locations specifically listed in Act 159—class 4 roads, playgrounds, and parks—are places that are typically owned by a municipality or other governmental entity. The Board's definition of a public trail is consistent with this list because it includes trails on public lands as well as several major trails that may cross some private land but are permanently protected and managed for free public use in affiliation with government agencies.

¶ 44. Plaintiffs cite examples of other trails that are mapped and signed and may cross private land, such as the Cross Vermont Trail or the Kingdom Trails, and argue that the exclusion of these trails shows that the rule's definition is arbitrary. There is no evidence about these trails in the record, and plaintiffs have not shown that they are dedicated and managed for free public use in conjunction with government entities in the same manner as the trails listed in the rule. We therefore find this argument unpersuasive. Plaintiffs further argue that the rule's definition of

20

public trail is arbitrary because the rule also requires setbacks from legal trails, which often cross private land. However, legal trails are by definition public rights of way, and thus fall within the category of public locations covered by the rule. See 10 V.S.A. App. Ch. 1, § 44(3.11) (defining "legal trail" as "a public right of way designated as a trail by a municipality as defined in Title 19 V.S.A. § 301(8)").

¶ 45. The Board's definition of "public trail" is reasonable and not arbitrary. The rule provides clear notice of where trapping setbacks are required—trails on public land and certain other heavily used trails that are formally mapped and signed and are widely recognized as "public"—and is not difficult to understand. It also avoids unnecessary conflict with Vermont's existing legislative scheme governing trapping, which requires trappers to secure landowner permission before setting traps on private property and gives private landowners the right to exclude trappers. See 10 V.S.A. § 4707 (requiring trapper to notify landowner of intent to set trap on private property and stating that landowner may refuse or revoke permission at any time). We therefore affirm the validity of the definition.

E. Traps Set in Water or Ice

¶ 46. Finally, plaintiffs claim that the exclusion of traps set in water or ice from trapping setbacks is inconsistent with Act 159's requirement that traps be set at a "safe distance" from recreational areas and is arbitrary. As noted above, the Department's BMPs recommended that traps set in water be omitted from setback requirements, so the rule is facially consistent with Act 159. We agree with the trial court that the rule is also not arbitrary or inconsistent with the legislative goal of ensuring that traps are set at a safe distance from trails and recreational areas.

¶ 47. The Board explained that trapping posed a very low risk to public safety. It noted that there was no evidence that any person had been caught or injured by a trap in Vermont, including under ice. There were also no known incidents related to pets being caught in traps under the ice. Persons and pets cannot access traps set under ice unless they reach or jump into

21

the ice hole, which is usually brushed over or frozen. There were only two known incidents involving pets caught in traps set in the water, both of which involved nuisance traps and occurred outside of trapping season. Because aquatic trapping season runs from the end of October to the end of March, when people and pets are less likely to enter the water, the risk to public safety of recreational water-set traps is low. The Board further explained that semi-aquatic species such as beaver are trapped in areas where they are most active, which is typically within fifty feet of a shoreline. Imposing the setback requirement to water sets would increase the risk of the animals becoming nuisances by flooding waterways, roadways, and recreational areas, and would increase the need for out-of-season trapping.

¶ 48. The Board's explanation for excluding water- and ice-set traps from setback requirements is reasonable, consistent with Act 159, and supported by the record. Plaintiffs do not dispute that there is little to no evidence that traps placed in water or ice during trapping season pose a safety risk to humans or pets. The two reported incidents of pets being harmed by traps occurred in nuisance traps set outside of trapping season; thus, requiring setbacks would not have prevented these incidents. The low risk of such traps, coupled with the potential that setback requirements would actually increase conflicts by requiring more out-of-season nuisance trapping, supports the Board's chosen approach. We therefore see no reason to invalidate the rule.

¶ 49. As explained above, the Board met its burden of demonstrating that the objected-to portions of the furbearing species rule were consistent with legislative intent and were not arbitrary. We therefore affirm the decision of the trial court.

Affirmed.

FOR THE COURT:

_____
Associate Justice

22